NO. 07-10-0278-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

MARCH 11, 2011
_____

JKR PERSONAL CARE, LLC d/b/a HOME
INSTEAD SENIOR CARE,

                                                            Appellant
                              v.

JEAN MARIE BRYANT,

                                                            Appellee
_____

FROM THE COUNTY COURT AT LAW NO. 1 OF TARRANT COUNTY;

NO. 08-61706-1; HONORABLE R. BRENT KEIS, PRESIDING
_____

*Memorandum Opinion*
_____

Before QUINN, C.J., and HANCOCK  and PIRTLE,  JJ.

JKR Personal Care, L.L.C. d/b/a Home Instead Senior Care (JKR) appeals a take-nothing judgment granted in favor of Jean Marie Bryant (Bryant) after a bench trial. JKR had sought to recover $12,865 for services allegedly provided to Bryant's parents. Recovery was sought on the basis of two contracts she signed as her parents' representative.  JKR contends that the trial court's decision contradicted the evidence,

which evidence allegedly established, as a matter of law, that Bryant agreed to pay for the charges. We overrule the issue and affirm the judgment.

### Background

On May 24, 2007, Bryant signed a "Service Agreement" to obtain home care services for her parents, Timothy and Mary Lou Ford. Per the accord, the "undersigned" expressly bound themselves to "pay for the Services provided under this Agreement . . . ." Moreover, Timothy and Mary Lou Ford were designated as "the undersigned" and the "Client." Though Bryant's name appears on the document, it did so under the heading "Client's Representative."[1]

Of record is another document entitled "Plan of Care." It was executed on June 9th, approximately two weeks after the Service Agreement and described the particular care to be given "Timothy 'Tim' Ford." Moreover, it expressly stated that "Supervisor Visits and [sic] new Plan of Care will be performed every: 180 days." Bryant signed this instrument above the title "Client / Client Representative."

Unlike the Service Agreement, the Plan of Care contained a statement specifying that "Home Instead Senior Care will invoice Client with receipt for all expenses related to the care and the *Client/Representative* is responsible for such charges." (Emphasis added). Furthermore, Bryant testified that she eventually signed three "plans of care" for her father "as he got worse" and three for her mother "as she got better." No one presented evidence addressing whether these additonal plans of care contained the same verbiage or described the same obligations as that contained in the June 9th writing.

---

[1]Bryant testified at trial that she had power of attorney for her parents.

After Bryant's parents died, JKR sought to hold her personally liable for services owed. The testimony from JKR's representative disclosed that it knew Bryant signed the aforementioned agreements as the representative of her parents. Indeed, no one disputes that she so signed the documents. But, because the Plan of Care specified that the "Client/Representative" would be responsible for the charges, JKR believed Bryant bound herself to pay for them as well, despite the conditional nature of her signature. That Bryant or her brother paid over $25,000 to JKR finds evidentiary support. And, it was a balance of $12,865 sought at trial.

After hearing evidence from both litigants, the trial court entered judgment denying JKR recovery. No findings of fact or conclusions of law were executed, however.

### Authority and Its Application

When trial is to the bench, as opposed to a jury, and no findings of fact have been executed, we may imply the existence of findings that support the outcome and enjoy evidentiary support. *Hayes v. Anderson,* 315 S.W.3d 170, 173 (Tex. App.–Tyler 2010, pet. denied).

Next, an agent signing a contract for the benefit of a disclosed principal generally is not personally liable on the contract. *Roe v. Ladymon,* 318 S.W.3d 502, 515 (Tex. App.–Dallas 2010, no pet.); *see also Harco Energy, Inc. v. Re-Entry People, Inc.,* 23 S.W.3d 389, 392 (Tex. App.–Amarillo 2000, no pet.) (stating that a person who acts as an agent for another when making a contract must disclose his agency capacity and identify the principal in order to avoid personal liability); *Bersen v. Live Oak Ins. Agency, Inc.,* 52 S.W.3d 306, 309-10 (Tex. App.–Corpus Christi 2001, no pet.) (stating the

3

same). As previously mentioned, evidence appears of record illustrating not only that Bryant signed her name on the Service Agreement under the heading "Client's Representative," but also that JKR knew she was executing the document in that capacity. Thus, the trial court had basis to find that she acted as the disclosed agent for her parents under that agreement and did not personally assume the liabilities imposed by it.

As for the obligation imposed by the June 9th Plan of Care, we assume *arguendo* that a disclosed agent can expressly agree to personally satisfy the principal's obligations. We further assume, *arguendo*, that the provision within the June 9th Plan stating that the "Client/Representative" was responsible for the charges made Bryant individually responsible for their payment. Yet, that document limited that "responsibility" to all expenses "related to the care" of the client. It said nothing about that responsibility encompassing "care" rendered under subsequent plans of care executed by the parties. This is of import because the June 9th writing required the execution of subsequent plans, and Bryant testified that she actually signed subsequent plans for both her mother and father. And, as previously noted, whether those subsequent plans held clauses saying that "Client/Representative" was responsible for "expenses related to the care" appears nowhere of record.

Nor is there evidence of record describing the nature of the services comprising the $12,865 outstanding balance sought by JKR. While the litigants did stipulate that $12,865 was due the company, the stipulation disclosed to the trial court failed to state that the expenses or services comprising that sum were "related to the care" of the

4

client under the June 9th Plan of Care.[2] It may well be that the only services provided by JKR were of that ilk. Or, it may be that it provided services outside that category. But, to conclude one way or the other would simply be a guess on our part, or on that of the trial court, for that matter, and that is something neither of us can do. Nonetheless, the only document that could be read as binding Bryant to pay JKR anything is the June 9th writing, and that writing limits the obligation solely to expenses related to "care." Thus, it was incumbent upon JKR to present some evidence illustrating that the outstanding balance related to the provision of "care" or that the "services" afforded the clients fell within that category.[3]

Also of note is the evidence that since execution of both the Service Agreement and June 9th Plan of Care, over $25,000 had been paid to JKR. Furthermore, only $672 was due for expenses incurred by "client" Timothy C. Ford as of September 12, 2007. This, when coupled with the evidence that Bryant executed subsequent plans of care, does not necessarily require one to infer that the $12,865 for services sought at trial (assuming they related to the provision of "care") related to the care provided under the June 9th Plan. It may well be that they related to care provided under some other plan of care which may or may not have had clauses binding both the client and representative to pay. Simply put, we do not know, and the record before the trial court did not obligate it to so deduce.

---

[2]The trial court was told that: "[o]posing counsel and I have agreed to stipulate to one point, that necessary attorney's fees are $4,500 for the Plaintiff [and] [t]he amount due for the *services* rendered by the Plaintiff is $12,865." (Emphasis added).

[3]The June 9th Plan stated that the "[c]lients are responsible for furnishing or providing monies for supplies." This suggests not only that JKR was itself a potential source of "supplies" but also that the debts due the company from its clients could arise from either the provision of supplies or the provision of care and services. And, the "Client/Representative," if anything, bound itself to pay only for "care," under the June 9th Plan.

Finally, the June 9th writing names Timothy "Tim" Ford as the client and establishes a plan of care for him. It says nothing of his wife, Mary Lou. Furthermore, it describes how the "Client/Representative" would be responsible for "such charges," those being the expenses contained in the invoice sent to the client, Timothy "Tim" Ford. Given this, the provision allegedly requiring the representative, Bryant, to also be "responsible for such charges" obligates the representative to only pay for the care rendered to Timothy "Tim" Ford. Now, the record contains evidence illustrating that services were provided by JKR to Timothy and Mary Lou. Whether the services to both comprised any part of the $12,865 sought at trial is unclear. The June 9th writing does name Timothy as the "customer," but whether "customer" meant only Timothy or both Timothy and Mary Lou is unknown. If it included services rendered to both, then the words used in the June 9th Plan were not enough to bind Bryant to pay for services attributable to Mary Lou's care. Moreover, the stipulation executed by the parties did not fill that void.

In short, the factfinder could reasonably have construed the evidence of record as failing to establish or to provide sufficient links establishing, as a matter of law, that Bryant, as the representative of her parents, contracted to pay for the $12,865 sought by JKR at trial. Accordingly, we affirm the judgment of the trial court.


Brian Quinn
Chief Justice

6